IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

UNITED STATES OF AMERICA

v.

**CHARLES JENKINS**

Criminal No:    3:21-713

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

**INFORMATION**

**COUNT 1**

THE GRAND JURY CHARGES:

1.    Medicare Program (Medicare) is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five, who are blind, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

2.    Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

3.    Part B of the Medicare Program is a medical insurance program that covered, among other things, certain durable medical equipment ("DME"). Specifically, Medicare Part B

1

covers medically necessary physician office services, including the ordering of durable medical equipment ("DME") such as arm, leg, back, and neck braces.

4.    Section 1847(a)(2) of the Social Security Act defines Off-The-Shelf ("OTS") orthotics as those orthotics described in section 186l(s)(9) of the Act for which payment would otherwise be made under section 1843(h) of the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.    Orthotics that are currently paid under section 1834(h) of the Act and are described in section 1861(s)(9) of the Act are leg, arm, back, and neck braces.    The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the longstanding Medicare definition of "braces."    Braces are defined in this section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

5.    To receive reimbursement from Medicare for non-physician items such as OTS orthotics, a DMEPOS supplier is required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92.    Claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

6.    By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and

2

contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

7.     By becoming a participating provider in Medicare, enrolled DME companies would have to list the owners and officers of the DME companies on Medicare Enrollment Application Form 855.

8.     Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered.   Health care providers that sought to participate in Medicare Part B and bill Medicare for the cost of DME and related benefits, items, and services were required to apply for and receive a "supplier number." The supplier number allowed a DME company to submit bills, known as "claims," to Medicare to obtain reimbursement for the cost of DME and related health care benefits, items, and services that a DME company had supplied to beneficiaries. In applying for its supplier number, a DME company must sign certifications, including, among other things that:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute).

9.     Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.

Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through SGS and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

### The Anti-Kickback Statute

10.     The Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), prohibits knowingly and willfully offering, paying, soliciting, or receiving a kickback or bribe to induce or reward referrals or the arranging for referrals of items or services reimbursable by a Federal health care program. The Anti-Kickback Statute attaches criminal liability to parties on both sides of an impermissible "kickback" transaction. In doing so, it ensures that patient care is based on what is best for the patient and not upon the financial interest of the person or entity making or arranging for, or receiving the referral; and to ensure that companies provide a service and do not merely purchase the ability to bill Medicare.

### Conspiracy

11.     From at least in or around November 2016, and continuing up to in or around April 2019, in the District of South Carolina and elsewhere, **JENKINS**, and others, knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to:

a.      knowingly defraud the United States by impairing, obstructing and defeating, and attempting to impair, obstruct, and defeat the lawful functions of the United States Department of Health and Human Services ("DHHS") and the Veterans

4

Administration ("VA") in the administration of Medicare and CHAMPVA[1];

b.      knowingly and willfully devised a scheme and artifice to defraud a health care program and to obtain by means of false and fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in violation of Title 18, United States Code, Section 1347;

c.      knowingly offering and paying remuneration, including kickbacks, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce a person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and CHAMPVA, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A);

d.      knowingly offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, and arrange for and recommend purchasing and ordering any good, for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and CHAMPVA, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

---

[1] CHAMPVA is a federal health care program for certain spouses and children of permanently and totally disabled veterans or deceased veterans. For those Medicare beneficiaries with CHAMPVA benefits, Medicare is the first payer for claims submitted by providers and then CHAMPVA typically pays the remaining balance.

Purpose of the Conspiracy

12.    It was the purpose of the conspiracy for the Defendant **JENKINS**, and others to enrich themselves and maximize profits at the expense of the United States and patients by participating in the following scheme.

Manner and Means of the Conspiracy

13.    The manner and means of the conspiracy operated substantially as follows and include, but were not limited to:

a.    Various DME companies in the scheme would hide ownership and controlling interests through the use of straw owners.

b.    The DME companies entered into Marketing and Business Process Outsourcing ("BPO") agreements with offshore call centers, to disguise the purchase of complete product orders that included physician prescriptions with supporting records authorizing OTS braces so that the companies could bill Medicare. The product orders were documented and tracked through a website.

c.    The DME companies would receive a file transfer from the offshore call centers that included a physician's prescription, the Medicare patient's information, and the DME that was to be shipped to the patient.

d.    The DME companies would receive invoices that disguised the fact that what was being purchased was completed product order.

e.    To maximize doctors signing the prescriptions, patients were incentivized to use telemedicine doctors. The telemedicine doctors did not have relationship with the Medicare patients, and could not physically examine them. Instead, most

6

prescribers performed cursory patient "consults" via telephone without the benefit of any audio-visual interaction with the patients as required under Medicare's telemedicine rules.

f.     The Defendant **JENKINS** was the 100% record owner of a DME Company, Magnolia Medical Supply Inc ("Magnolia") on the Form 855; however, JENKINS shared ownership of Magnolia with coconspirators.

Overt Acts

14.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of South Carolina;

a.     On 04/28/2017, Magnolia transferred $112,950 to coconspirator's account for Marketing. After taking a fee, the coconspirator then transferred the funds to an offshore call center.

b.     On 04/28/2017, **JENKINS** via Magnolia, transferred $34,425 to coconspirator's account for BPO. After taking a fee, the coconspirator then transferred the funds to an offshore call center.

c.     On approximately 05/03/2017, Magnolia received from the offshore call center products consisting of physician prescriptions for knee and shoulder braces for Medicare patient K.L.

d.     On approximately 05/16/2017, Magnolia claimed Medicare, claim 17132810181000, charging approximately $1,075 and received payment of approximately $518 for the K.L. knee brace and sleeve.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE

A.    CONSPIRACY:

Upon conviction for violation of Title 18, United States Code, Section 371 (conspiracy to

violate 18 U.S.C. § 1347 and 42 U.S.C. § 1320a-7b) as charged in this Information, the Defendant,

**CHARLES JENKINS,** shall forfeit to the United States any property, real or personal,

constituting, derived from or traceable to proceeds the Defendant obtained directly or indirectly as

a result of such offenses.

B.    PROPERTY:

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the property subject to

forfeiture includes, but is not limited to, the following:

    A.    Cash Proceeds/ Forfeiture Judgment:

        A sum of money equal to all proceeds the Defendant obtained, directly or
        indirectly, from the offenses charged in this Information, and all interest
        and proceeds traceable thereto, and/or such sum that equals all
        property derived from or traceable to his violation of Title 18 and Title 42.

    B.    Bank Account:

        $274,049.79 in funds and contents of Bancorp South Bank, Acct # x2517
        In the name of: Magnolia Medical Supply Inc.
        Asset ID: 19-FBI-003965

C.    SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture, as a result of any act

or omission of the Defendant –

        (a)    cannot be located upon the exercise of due diligence;
        (b)    has been transferred or sold to, or deposited with, a third person;
        (c)    has been placed beyond the jurisdiction of the Court;
        (d)    has been substantially diminished in value; or
        (e)    has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the said Defendants up to the value of the above described forfeitable property;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

M. RHETT DEHART (AFB/DAS)
ACTING UNITED STATES ATTORNEY